FILED

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA   MAR 13 2003
NORTHERN DIVISION

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| LANNA M. ALLEGRO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 01-D-1139-N |
| | ) | |
| MONUMENTAL LIFE INS. CO., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant's Motion For Summary Judgment, filed December 30, 2002, and Plaintiff's Response, filed January 23, 2003. (Doc. Nos. 17, 23.) The parties have filed briefs and evidentiary submissions in support of their respective positions. (Doc. Nos. 18, 20, 23, 26.) Also before the court are two Motions filed by Plaintiff on January 21 and 22, 2003, wherein Plaintiff moves the court to strike certain affidavits and an expert report submitted by Defendant in support of its Motion For Summary Judgment. (Doc. Nos. 21-22.) After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendant's Motion is due to be granted in part and denied in part and that Plaintiff's Motions are due to be denied as moot.

EOD 3/13/03

65

# I. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).  The parties do not contest personal jurisdiction or venue.

# II. SUMMARY JUDGMENT STANDARD

Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986).  At this juncture, the court assumes that the evidence of the non-movant is true and draws all justifiable inferences in the light most favorable to the party opposing the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The court's function is not to weigh the evidence and determine the truth of the matter, but to decide whether there is a genuine issue for trial.  Id. at 249-50.

# III. FACTS

This case involves a dispute over a claim for benefits under a group mortgage accidental death insurance policy ("policy") which Plaintiff Lanna M. Allegro and her husband, James Allegro, purchased from Defendant.  Plaintiff made a claim under the policy after her husband, who was driving while intoxicated, died in a wreck.  Defendant

denied her claim based upon an exclusion in the policy which reads: "We will not pay a

benefit for death caused by or resulting from: . . . (6) alcohol intoxication, as defined in

the state where the accident occurred[.]" (Def. Evid. Submission, Ex. B.)  Asserting that

she was wrongfully denied benefits, Plaintiff filed the instant eight-count complaint

against Defendant.  Plaintiff seeks compensatory and punitive damages on claims for

fraudulent misrepresentation, fraudulent suppression, negligence and/or wantonness,

breach of contract, normal bad faith, abnormal bad faith, the tort of outrage and civil

conspiracy. (Compl. ¶¶ 12-45.)  Viewed in the light most favorable to Plaintiff, the facts

precipitating the denial of Plaintiff's claim are as follows.

On or about April 8, 1999, a sales representative of Defendant telephoned the

Allegro residence and spoke with Plaintiff concerning the purchase of the policy at issue.

The sales representative informed Plaintiff that for a monthly premium of $6.96

Defendant would provide her and her spouse with a policy that would pay her mortgage

loan up to $250,000 in the event that either died as a result of an accident.  (Pl. Dep. at 81,

86, 89, 153.)  Plaintiff responded that she wanted to purchase the policy.  (Id. at 85.)

After verifying Plaintiff's and her husband's names, mailing address and social security

numbers, the sales representative transferred Plaintiff to a supervisor.  (Id. at 81-82, 88-

89.)  The supervisor confirmed the information obtained from the sales representative,

repeated that the policy would provide an "accidental death benefit" in the form of a

3

mortgage satisfaction up to $250,000, and informed Plaintiff that she had been approved

for coverage.   (Id. at 89-90.)  No other discussion occurred as to any additional terms of

the policy; nor was there any mention of any exclusions.

Some "couple days" after this telephone solicitation, Plaintiff received a letter

from Defendant dated April 9, 1999, regarding her enrollment in the policy.  (Id. at 90,

96; Pl. Evid. Submission, Ex. C.)  In the letter, Defendant summarized the benefits,

stating:  "Your mortgage loan, up to $250,000, will now be paid off in the event of your

accidental death," and, "[i]f your balance is less than $50,000[,] then your beneficiary will

receive the difference as a cash payment."  (Pl. Dep. at 90; Pl. Evid. Submission, Ex. C.)

The letter validated that Plaintiff and her spouse were covered under the policy, that the

premium would be $6.96 per month, and that the premium would be "collected" with the

monthly mortgage payment.  (Pl. Evid. Submission, Ex. C.)  Moreover, in the letter,

Defendant stated that the "Insurance Documents" would be mailed in "two to three

weeks" and that, after receipt of these documents, she and her husband would have 30

days to rescind coverage if not "completely satisfied."[1]  (Id.)  The "P.S." section of the

letter once again reiterated that "[y]our insurance documents are being prepared now and

will be sent to you shortly, so look for them in the mail."  (Id.)

_____

[1] The court notes that the letter does not define what documents comprise
"Insurance Documents."

4

Within approximately a month of receiving Defendant's April 9 letter, Plaintiff made two telephone calls to Defendant to inquire as to why she had not received the policy or any other documents pertaining to coverage.  (Pl. Dep. at 94, 96-97)   She was informed that the documents would "be in the mail . . . soon." (Id. at 98.)  In July 1999, payments on the monthly premiums commenced.  (Id. at 99, 102; Pl. Evid. Submission, Ex. C.)  Because Plaintiff still had not received a copy of the policy or any other document outlining the policy's terms, she called Defendant again.  (Id. at 99.)  A representative apologized to Plaintiff, stating that the company must have "overlooked" her.  (Id. at 99-100.)   The representative assured Plaintiff that Defendant "would get the documents to [her] as soon as [it] could." (Id.)  Despite her conversations with Defendant's representatives, Plaintiff never received a copy of the policy.  (Id. at 154.)

On February 24, 2000, Plaintiff's husband, Mr. Allegro, died from injuries sustained in a single-vehicle crash on I-65 in Conecuh County, Alabama.  (Pl. Evid. Submission, Exs. E, G.)  Around 10:30 p.m. on February 23, the van Mr. Allegro was driving struck a guard rail and overturned.  (Def. Evid. Submission, Ex. C (Alabama Uniform Traffic Accident Report); Ex. E (Ala. Dept. of Public Safety Investigation); Pl. Evid. Submission, Ex. D (Alabama Uniform Traffic Accident Report).)  Mr. Allegro was thrown from the vehicle.  (Id.)  When law enforcement officers arrived at the scene, Mr. Allegro was critically injured, but alive.  (Id.)

5

In completing the standard uniform accident traffic accident report, the investigating officer noted that the road surface was asphalt, that there were no "contributing road defects," that the road conditions were "dry," and that there were no "material[s] in the roadway" contributing to the accident.  (Def. Evid. Submission, Ex. C; Pl. Evid. Submission, Ex. D.)  Further, the officer indicated that, in his opinion, alcohol was a factor in the accident and that Mr. Allegro "apparently" was "asleep."  (Def. Evid. Submission, Ex. C; Pl. Evid. Submission, Ex. D.)

Mr. Allegro was transported to Vaughn Hospital in Evergreen, Alabama.  (Def. Evid. Submission, Ex. C (Emergency Room Record).)  There, the determination was made to fly him by helicopter to Baptist Hospital in Pensacola, Florida.  He was unresponsive to emergency medical treatment while en route and was declared dead shortly after arriving at Baptist Hospital.  (Id. (Transfer Form; Baptist Hosp. Result Report).)  The autopsy report attributes the cause of death to "blunt force injuries to the head and chest," and a toxicological report shows that, at the time of death, Mr. Allegro had a blood alcohol level of .178, more than two times the legal limit under Alabama law. (Def. Evid. Submission, Ex. D); see Ala. Code § 32-5A-191(a)(1) (1999).  In the section of the death certificate titled "probable manner of death," the medical examiner who performed the autopsy specified the death as "accidental," given five alternatives of

"natural," "accident," "suicide," "homicide" or "undetermined." (Pl. Evid. Submission, Ex. G.)

The day after her husband's death, Plaintiff called Defendant regarding the procedures for filing a claim. A representative assisted her, and, shortly, thereafter, Plaintiff received a claim form in the mail from Defendant which she submitted on or around March 7, 2000. (Pl. Dep. at 101-05; Def. Evid. Submission, Exs. L, M.) Between March 14 and May 5, 2000, Plaintiff received three written correspondences from Defendant concerning the status of her claim. (Def. Evid. Submission, Exs. N, O, P.) These letters indicate that Defendant was in the process of obtaining and/or reviewing the medical examiner's report, the records from the hospital facilities which treated her husband, and the reports from the investigating law enforcement agencies. (Id.)

Subsequently, in a letter dated May 12, 2000, Defendant denied Plaintiff's claim relying on the alcohol intoxication exclusion in the policy. The letter states, in pertinent part, as follows:

> Please be advised that we have now completed our investigation of the claim which you filed on your spouse, James Allegro.
>
> • • •
>
> Under the "**Benefits**" provision of [your] policy, it states:
>
>> "We will pay the Accidental Death Benefit shown in the Schedule when we receive proof that you died as a result of an Injury, provided death occurred within 365 days of the Injury. The benefit

7

will be applied to reduce or pay off your Outstanding Balance at the time of your death."

Under the "**Definitions**" section, "**Injury**" is defined as follows:

"**INJURY** means bodily injury caused by an accident, independently of all other causes. The Injury must occur while insurance is in force under the policy. The Injury must be the sole and direct cause of death. The Injury must not be caused, or contributed to, by Sickness."

Under the "**Exclusions**" section, it reads, in part, as follows:

"We will not pay a benefit for death caused by or resulting from: (6) alcohol intoxication, as defined in the state where the accident occurred";

We have obtained a copy of the report from the Office of the Medical Examiner of District One, Florida, which revealed that Mr. Allegro had a blood alcohol level of 0.178 at the time of the accident. Our Medical Director has reviewed these results and has determined that the alcohol level, which was more than twice the legal limit for driving in the State of Alabama, contributed to the accident which led to your husband's death. Therefore, because the loss was not caused by an accident, independently of other causes, and alcohol intoxication contributed to the loss, we are unable to consider this claim for benefits.

We regret that our determination could not have been more favorable, however, our decision is based on the terms of the policy and the information submitted to our office. Should you have any additional information which you feel may affect our decision, please feel free to submit that to our office for review.

(Def. Evid. Submission, Ex. Q (emphasis in original).)

Defendant's denial of Plaintiff's claim and its reliance on the alcohol intoxication exclusion are the facts which precipitated Plaintiff's lawsuit. The primary premise underlying Plaintiff's assertion of liability is that Plaintiff claims she never received a

copy of, nor had knowledge of, the policy's terms, including the exclusion upon which

Defendant relies.  Defendant, on the other hand, contends that it mailed Plaintiff a

certificate of insurance which outlined the policy's terms and exclusions, including the

alcohol intoxication exclusion at issue.  (Def. Br. at 15; Def. Evid. Submission, Ex. B.)  In

support of its assertion, Defendant has submitted the affidavit of Colleen Gizinski, its

Vice President of Operations, who has personal knowledge of and attests to the business

procedures employed by Defendant concerning the mailing of certificates of insurance.

(Gizinski Aff. ¶ 2 (Doc. No. 20).)  According to Gizinski, when marketing to sell one of

Defendant's policies, a representative of Defendant contacts the potential insured by

telephone to inquire as to whether he or she is interested in purchasing coverage under the

policy.  (Id. ¶ 3.)  If the individual contacted wants to purchase a policy, the sales

representative obtains certain information from the individual, including, but not limited

to, his or her name and mailing address.  (Id.)

When the solicitation call results in a sale, an entry is made in Defendant's

computer system for preparation of a certificate of coverage.  (Id. ¶ 4.)  The computer

entry contains, among other items, the individual's name and mailing address as provided

by the insured during the solicitation call.  (Id.)  After processing is completed each day,

Defendant's computer system automatically prints "a fulfillment package" which contains

a personalized welcome letter, the certificate of insurance and a customer satisfaction

survey.  (Id. ¶ 5.)  The certificate of insurance contains, among other items, the

individual's name and mailing address as provided by the insured.  (Id.)  The next

9

morning, employees of Defendant collect the "fulfillment packages" and place them in envelopes for mailing to the insureds.  (Id. ¶ 6.)  The envelopes used by Defendant contain clear "windows" which make visible the name and mailing address printed on the certificate of insurance.  (Id.)

Once the fulfillment packages are placed in the envelopes, Defendant's employees affix postage and submit the envelopes for delivery to the United States Postal Service. (Id. ¶ 7.)  In cases where a mailing address is incorrect, the United States Postal Service routinely returns the envelopes to Defendant marking them as "undeliverable."  (Id. ¶ 8.) Defendant's employees then attempt to ascertain the correct mailing address.  Where a mailing is unsuccessful, the fulfillment package is "microfilmed" as part of the application file, and the computer record is "marked" which allows Defendant's employees to identify the certificates of insurance which were not delivered to the insured.  (Id.)  All other certificates not returned to Defendant are assumed to have been delivered to the correct mailing address by the United States Postal Service.  (Id.) According to the Monumental Telemarketing Transmittal Detail Report, the Allegros' mailing address is listed as 1302 Huckleberry Lane, Prattville, AL  36067-7265.[2]  (Def. Evid. Submission, Ex. B.)

_____

[2] Plaintiff has not disputed that Defendant recorded her correct mailing address. (Pl. Dep. at 34, 152-53; Def. Evid. Submission, Ex. M.)

# IV. DISCUSSION

## A. Breach of Contract

Defendant argues that it cannot be held liable for breach of contract because it "had no duty to pay [Plaintiff's] insurance claim" pursuant to the exclusion in the policy which excepted from coverage deaths caused by alcohol intoxication. (Def. Br. at 17 (Doc. No. 18).)  In response, Plaintiff asserts that Defendant is estopped from relying on the exclusion based upon § 27-14-19(a) of the Code of Alabama because Defendant never "delivered" a copy of the policy to Plaintiff. (Pl. Resp. (Doc. No. 23) at 9.)

Section 27-14-19(a) states: "(a) Subject to the insurer's requirements as to payment of premium, every policy shall be mailed or delivered to the insured or to the person entitled thereto within a reasonable period of time after its issuance, except where a condition required by the insurer has not been met by the insured." Ala. Code § 27-14-19(a) (1998).  In a decision issued pursuant to this court's certified question, the Supreme Court of Alabama held that, in a breach of contract action,

> § 27-14-19 requires that the insurance policy be "mailed or delivered" to the purchaser of a policy and to the named insured, and that an insurer may be estopped from asserting conditions of, or exclusions from, coverage where such a purchaser or insured is prejudiced by the insurer's failure to comply with the statute.

Brown Mach. Works & Supply Co., Inc. v. Insurance Co. of North America, 659 So. 2d 51, 61 (Ala. 1995).

In rebuttal, Defendant makes several arguments.  First, Defendant posits that the facts of this case are distinguishable from Brown Machine Works & Supply Company because in that case the insurance company admitted that it had neither "mailed" nor "delivered" a copy of the policy to the plaintiff.  (Def. Reply at 8); see Brown Machine Works & Supply Co., 659 So. 2d at 53.  Here, to the contrary, Defendant retorts that § 27-14-19 contemplates "mailing," an element ignored by Plaintiff in her Response, and that Defendant complied with statute's mailing requirement.  Invoking the legal presumption that "[a] letter, properly addressed with sufficient postage, and unreturned to the sender whose address is shown on the envelope, was received by addressee," Currie v. Great Central Ins. Co., 374 So. 2d 1330, 1332 (Ala. 1979), Defendant asserts that it has submitted sufficient proof that it mailed to Plaintiff's residence the certificate of insurance which embodied the terms of the policy, including the exclusion at issue.  (Def. Reply at 7).

Defendant correctly states the law as to the presumption of mailing:  The presumption of mailing is rebuttable, but an insured's statement of denial, "without more, does not overcome the presumption that he [or she] received" the document at issue. Currie, 374 So. 2d at 1332; see also Montz v. Mead & Charles, Inc., 557 So. 2d 1, 5 (Ala. 1987); see also Konst v. Florida East Coast Railway, 71 F.3d 850, 851 (11th Cir. 1996) ("The common law has long recognized a rebuttable presumption that an item properly mailed was received by the addressee."); (Def. Reply at 7.)  The court finds that

Defendant's evidence is not as definitive as it proclaims and that Defendant has not presented sufficient evidence to take the issues of mailing and receipt away from the jury.

According to Gizinski's affidavit, Defendant's customary business practice would have resulted in the certificate of insurance being mailed to Plaintiff the day after Plaintiff accepted coverage through the solicitation call; in other words, Defendant's evidence is that the certificate of insurance is included in the first written correspondence mailed to Plaintiff. The information relayed to Plaintiff in the initial letter dated April 9, 1999, which she received from Defendant, however, appears to contradict Gizinski's attestations. The one-page letter informs Plaintiff not once but twice that Defendant was in the process of preparing the insurance documents and would mail them to Plaintiff in the upcoming weeks. (Pl. Evid. Submission, Ex. C.) Construing all inferences in favor of Plaintiff, as the court must do at this stage, this letter, absent any explanation from Defendant, conveys that no documents are attached to it, but, rather, will be sent through the mail at a later date.

Moreover, the letter states that, once Plaintiff receives the insurance documents, she and her husband will have 30 days to rescind coverage if not "completely satisfied" with the terms. (Id.) The logical inference arising from the letter's "30-day right to rescind" terminology is that the insurance document which would trigger the 30-day review period was forthcoming. The parties have submitted to the court only one insurance document which discusses the commencement of the 30-day window for rescission, and that document is the certificate of insurance. Indeed, the letter's language

13

tracks the terms of the certificate of insurance, specifically the certificate's section titled "Thirty Day Right To Examine Certificate."  (Def. Evid. Submission, Ex. C (last page).) Thus, from aught that appears, no certificate of insurance was provided to Plaintiff in the initial correspondence she received from Defendant, which is contrary to Ginzinski's evidence concerning Defendant's customary business practices.  Defendant has failed to explain this seeming contradiction, and has not explained why it appears that Defendant did not follow its usual business practices as pertains to Plaintiff.

Moreover, Plaintiff's telephone conversations with Defendant's representatives regarding the failure of Defendant to provide her with terms of the policy lend support to Plaintiff's contentions.  Namely, the representatives with which Plaintiff spoke never confirmed that Defendant, in fact, had mailed the certificate of insurance.  (Pl. Resp. at 94, 96-100.)  Furthermore, one representative appears to admit error stating that the mailing must have been "overlooked" and that Defendant would provide her with the documents as soon as possible.  (Id. at 99-100.)

Defendant also asserts that there is no evidence that the certificate of insurance allegedly mailed to the Allegro residence was returned to Defendant's office by the Postal Service as undeliverable or otherwise.  Defendant's assertion, however, is contained only in a brief.  Arguments in briefs are not evidence which the court may consider in determining whether a genuine issue for trial exists.  See, e.g., Franz v. Raymond Eisenhardt & Sons, Inc., 732 F. Supp. 521, 528 (D.N.J. 1990).  According to the affidavit submitted by Gizinski, Defendant maintains a record on microfilm and in its computer

14

system as to all "fulfillment packages" which Defendant is unable to mail due to an erroneous mailing address.   (Gizinski Aff. ¶ 8.)  Assuming *arguendo* for the moment that Defendant followed its usual mailing procedures in this case, from aught that appears, Defendant could have submitted <u>evidence</u> through Gizinski or another corporate employee to the effect that a review of Defendant's records reveals that Plaintiff's name is not contained within those records, yet Defendant has failed to do so.  The court simply cannot ignore the absence of evidence on this point.  In sum, the court finds that the evidence is rife with contradictions regarding the mailing of the certificate of insurance; therefore, the court cannot find as a matter of law that Defendant has invoked the presumption of mailing.

Notwithstanding the inconsistencies between Defendant's usual practices for mailing certificates of insurance and its procedure utilized in this case, Defendant argues that its proof of mailing further is buttressed because Plaintiff only contends that "<u>she never received a copy</u>" of the certificate of insurance.  (Def. Reply at 7 (emphasis in Reply).)  Defendant points out that there is no evidence that her husband, also an insured, did not receive the certificate.  (<u>Id.</u>)  The Supreme Court of Alabama rejected a similar argument in *Ex parte* Clarke, wherein it examined whether the insurer had failed to comply with § 27-14-19(a) by not mailing or delivering to an insured a copy of an insurance endorsement:

> In her affidavit, Patricia Clarke [the insured] denied that she had received, or had had any knowledge of, the endorsement.  Allstate takes issue with the sufficiency of her denial, however, pointing out that she did not state whether Stanley Clarke [Patricia Clarke's husband, also an insured] had ever received, or had had knowledge of, the endorsement.

15

However, Allstate first relied on the alleged endorsement when it submitted Noble Tinnea's affidavit in support of its motion for summary judgment. That affidavit is dated May 3, 1996. Stanley Clarke had died on November 19, 1995. Thus, Stanley Clarke never had any occasion to state whether he had received the endorsement Allstate claims to have sent, and presumably Patricia Clarke could not affirmatively state that he had not. Patricia Clarke's affidavit did not directly state that no copy of the endorsement was included among the Clarkes' papers regarding their Allstate policy. However, by submitting a copy of that policy, without the endorsement, as a "true and correct copy of our Allstate insurance policy," she presented substantial evidence that no copy of the endorsement was included with the Clarkes' copy of the policy. Together with Patricia Clarke's statement that she had not received the endorsement, the record contains substantial evidence indicating that Allstate had not mailed or delivered the endorsement to the Clarkes.

728 So. 2d 135, 140 (Ala. 1998).

Here, as well, obviously, Plaintiff's spouse, whose death started the events which led to the onset of this litigation, cannot present evidence regarding the receipt or not of the certificate of insurance. In one sense, Plaintiff's evidence is stronger than that in _Ex parte Clarke_ because Plaintiff states affirmatively that she opened all of her husband's mail delivered to their residence and that her husband never had any conversations with any representative of Defendant. (Pl. Dep. at 91.) The court recognizes that in _Ex parte Clarke_ the insured did not provide _any_ evidence that it either mailed or delivered the endorsement to the plaintiffs. The court finds, however, that the distinction does not weaken the court's reliance on _Ex parte Clarke_, given the disputed issues of fact surrounding Defendant's evidence as to proof of mailing. At the very least, the court finds that _Ex parte Clarke_ forecloses Defendant's argument regarding the failure of

Plaintiff to affirmatively demonstrate that her deceased spouse did not receive the certificate of insurance or have knowledge of the exclusion at issue.

As a final point on the issue of the presumption of mailing, the court finds that the primary two decisions upon which Defendant relies, Currie and Montz, *supra*, are distinguishable on their facts from the instant case.  It is true that in both cases the Supreme Court of Alabama found the insured's denial of receipt insufficient and, thus, affirmed judgments in favor of the insurer.  As stated in *Ex parte* Alfa Mutual General Insurance Company, 742 So. 2d 182 (Ala. 1999), however, "a close reading of Montz shows that the insured did not deny receiving notice, but instead merely stated that 'he [did] not recall receiving notice.'"  Id. at 187 (quoting Montz, 557 So. 2d at 5). Moreover, it was undisputed in Montz that the insured mailed the notice of cancellation. A question of fact, on the other hand, exists in this case on the question of mailing.  Thus, the contradictory evidence as to the mailing, combined with Plaintiff's affirmative denial (Pl. Dep. at 154), distinguishes this case from Montz.  Furthermore, as also pointed out in *Ex parte* Alfa Mutual General Insurance Company, the Currie decision was decided on an ore tenus hearing which allowed the court to evaluate the credibility of the evidence and resolve conflicting evidence.  742 So. 2d at 188.  Here, to the contrary, the court is prohibited from weighing the evidence at the summary judgment stage.  See Anderson, 477 U.S. 249-50.

Turning to Defendant's final argument in opposition to Plaintiff's estoppel theory, Defendant contends that Plaintiff has suffered no prejudice.  (Def. Reply at 8-9.)

17

Defendant points to Plaintiff's deposition testimony wherein Plaintiff answered the following question propounded by defense counsel:

> Q. So you're saying the alcohol exclusion itself may not have prevented you from buying the policy, had you known?
> A. Right.

(Pl. Dep. at 125.)  The question contains the words "may not have," not "would not have."  The question, thus, is couched in terms of possibilities, not absolutes.  The phrasing of defense counsel's question cannot be deemed insignificant.  Suffice it to say, Plaintiff did not state unequivocally that she would have purchased the policy had she known about the exclusion.  Moreover, at other points during her deposition, Plaintiff makes clear that she and her husband would have wanted the opportunity to review the policy to make their own determination as to whether the exclusion rendered the policy unsatisfactory, rather than having the exclusion forced upon them without their knowledge as to its existence.  (Id. at 122-31.)

In sum, for the reasons stated herein, the court finds that there remains an issue of fact as to whether Defendant provided Plaintiff the terms of the exclusion through the mail and, thus, whether Defendant is estopped from denying coverage based upon the

exclusion.[3] Defendant's Motion For Summary Judgment on Plaintiff's breach of contract claim, therefore, is due to be denied.

## B. Fraudulent Misrepresentation

Plaintiff also brings a claim for fraudulent misrepresentation. As the misrepresentation, Plaintiff points to the agent's statements to Plaintiff in the solicitation telephone call. Given that Defendant never provided Plaintiff with a document informing her of the exclusion at issue, Plaintiff proffers that the sole representation Defendant made to Plaintiff concerning coverage was that the policy would pay off her mortgage up to $250,000. The representation contained no qualifiers, and, thus, according to Plaintiff, the agent misrepresented the complete parameters of coverage. (Pl. Resp. at 5.) Defendant, however, contends that Plaintiff's claim is one for promissory fraud and that Plaintiff has failed to demonstrate evidence of a present intent to deceive. (Def. Br. at 10-12.) Even assuming *arguendo* that Plaintiff's claim "is not a claim for promissory

---

[3] The court notes that Plaintiff argues that, even assuming her coverage is subject to the policy's alcohol intoxication exclusion, there is insufficient evidence that her husband's death was caused by his alcohol intoxication. (Pl. Resp. at 10-12); see, e.g., Freeman v. Crown Life Ins. Co., 580 S.W.2d 897, 901 (Tex. Ct. App. 1979) ("Even as to policies containing express exclusions of benefits when the insured is intoxicated, a causal relation between the intoxication and the death must be shown in order to deny coverage."). The court expresses no opinion on the merit of Plaintiff's argument because it need not. The court's finding that Plaintiff's estoppel theory is viable obviates the need for the court to ascertain whether the exclusion at issue applies to the facts of this case so as to preclude coverage.

fraud," Defendant asserts that Plaintiff has failed to prove the elements of misrepresentation and reasonable reliance.  (Id. at 12-14.)

 To succeed on a fraud claim based upon a misrepresentation, a plaintiff must show: "(1) that the defendant made a false representation concerning an existing material fact; (2) that the defendant made that misrepresentation while knowing that it was false, or made it recklessly, or made it with no knowledge as to its truth or falsity; (3) that the plaintiff reasonably relied on the misrepresentation; and (4) that the plaintiff incurred damage proximately caused by the reliance."  Luck v. Primus Automotive Financial Servs., Inc., 763 So. 2d 243, 245-46 (Ala. 2000); Foremost Ins. Co. v. Parham, 693 So. 2d 409 (Ala.1997); Ala. Code § 6-5-101 (1993) ("Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.").  A cause of action for fraud, thus, requires that a plaintiff demonstrate a misrepresentation of a past or present material fact.  On the other hand, a promissory fraud claim involves a plaintiff's assertion that a defendant promised to do something in the future, but failed to keep that promise; therefore, to prove a promissory fraud claim, in addition to proving the elements of fraudulent misrepresentation, a plaintiff must establish "(1) that the defendant intended, at the time of the misrepresentation, not to perform the act promised; and (2) that the defendant intended to deceive."  Baker v. Hanks, 661 So. 2d 1155, 1157 (Ala. 1995).

The court finds that the Supreme Court of Alabama's decision in <u>Allstate Insurance Company v. Hilley</u> ("<u>Hilley</u>"), a decision relied upon by Plaintiff (Pl. Resp. at 6-7), forecloses Defendant's assertion that Plaintiff's claim involves a promise that Defendant would perform some future act.  595 So. 2d 873 (Ala. 1992).  In <u>Hilley</u>, the court affirmed a judgment entered on a jury verdict for the plaintiffs on a fraudulent misrepresentation claim against their insurer.  The plaintiffs purchased a homeowners policy from Allstate, and an Allstate agent represented to them "that, in the event their house was destroyed by fire, Allstate would either rebuild the house, replace the house, or pay the [plaintiffs] the $38,000 that Allstate assessed as the market value of their house."  <u>Id.</u> at 875.  Subsequently, while coverage was in effect, the plaintiffs' home was destroyed by fire, but Allstate refused to rebuild or replace the house and did not pay the plaintiffs the full $38,000.  <u>Id.</u>  In their lawsuit, the plaintiffs predicated their fraudulent misrepresentation claim on the agent's statement.  Allstate countered that the plaintiffs' fraud claim was one of promissory fraud and that the plaintiffs had not proved the additional elements necessary to succeed on such a claim.  The Supreme Court of Alabama disagreed.  The agent's representation was "a representation of the insurance coverage that the [plaintiffs] were purchasing.  The statement was not a promise to act in the future.  It was, rather, represented to the [plaintiffs] as a present fact of Allstate's obligations under the insurance policy."  <u>Id.</u>  The court, thus, concluded that the "trial court did not err in refusing to instruct the jury as to the additional elements of promissory fraud."  <u>Id.</u>

In its Reply, Defendant does not distinguish the <u>Hilley</u> decision, and, in fact, does not mention it.  (Def. Reply at 2 n.1.)  Defendant's omission is telling given that the court can find no distinction between the facts of this case and the facts of <u>Hilley</u> as pertains to the issue of whether Defendant's representation consisted of a past or present material fact or a promise that Defendant would do something in the future.  As in <u>Hilley</u>, the court finds that the representation made to Plaintiff by Defendant's agent in the solicitation call amounted to an explanation as to the scope of the insurance policy which Plaintiff was purchasing.  Thus, the court finds that Plaintiff need not prove the additional elements of promissory fraud.

Even absent the necessity of proving promissory fraud, Defendant asserts that Plaintiff has not demonstrated two of the elements of her fraudulent misrepresentation claim.  Defendant asserts that there was no misrepresentation because the agent's general description of the type of policy Plaintiff was purchasing was correct.  The court disagrees.  The misrepresentation lies in the fact that the agent's representation was not a complete statement as to the extent or limits of coverage.

Defendant also contends that Plaintiff's reliance on the agent's representation is unreasonable because it borders on the absurdity to assume that an insurance policy will contain no exclusions and that a policy will cover deaths resulting from illegal acts, such as driving under the influence of alcohol.  (Def. Br. at 13-14.)  Reliance is an essential element of a fraud action.  <u>See</u> <u>Torres v. State Farm Fire & Cas. Co.</u>, 438 So. 2d 757, 758 (Ala. 1983).  In this case, the "reasonable reliance" standard governs and requires that a

person's reliance be "reasonable under the circumstances." Id.; see also Foremost Ins. Co., 693 So. 2d at 420. "'If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, 'volunti non fit injuria.'" Potter v. First Real Estate Co., ___ So. 2d ___, 2002 WL 1042477, *11 (Ala. Sept. 6, 2002).

Initially, the court dismisses Defendant's argument that Plaintiff should have known that accidental death insurance policies typically contain exclusions. The court presumes that Defendant is relying, in part, on its expert opinion that exclusions are standard in the insurance industry and that the exclusion at issue was "typical of and consistent with those used in the industry." (Def. Evid. Submission, Ex. R.) Defendant's evidence has not demonstrated that such facts are well-known outside the insurance industry and, thus, should have been known by Plaintiff. Defendant asserts that, at the very least, Plaintiff's statement that she believed that the policy contained no exclusions is "disingenuous" given that she had another accidental death policy which contained a similar exclusion. (Def. Br. at 13-14.) Arguments as to Plaintiff's credibility, however, are for the jury, not for resolution by the court at the summary judgment stage. See Coats & Clark, Inc. v. Gay, 755 F.2d 1506, 1509 (11th Cir. 1985).

Whether Plaintiff's reliance was unreasonable based upon public policy considerations is not as straightforward, but the court finds that Defendant is not entitled to summary judgment on this argument either. The illegality of drinking while intoxicated is not in dispute. There also can be no dispute that there is a profound and

23

powerful public policy in Alabama against driving while under the influence of alcohol. See, e.g., Ala. Code § 32-5A-191(a)(1)-(2) ("(a) A person shall not drive or be in actual physical control of any vehicle while: (1) There is 0.08 percent or more by weight of alcohol in his or her blood; (2) Under the influence of alcohol."). Indeed, the hazards are great, and the perils often grave. The issue, however, is not whether public policy is against driving while intoxicated. Rather, the issue is whether, in the context presented in this case, it is against public policy to award a beneficiary accidental death benefits for an intoxicated insured's death in an automobile collision. The Supreme Court of Oklahoma addressed this very issue in Cranfill v. Aetna Life Ins. Co., 49 P.3d 703 (Okla. 2002). It rejected the insurer's argument that State of Oklahoma's public policy against driving while drinking "necessarily implies a public policy against awarding accident insurance benefits for the death of an intoxicated driver in a single-vehicle wreck." Id. at 709. The court recognized Oklahoma's "strong public policy" against driving while under the influence of alcohol, but stated:

> We do not believe . . . that denying accidental death benefits to [the beneficiary] in this context fosters the public policy against driving while drinking. Further, we find nothing in the Oklahoma statutes or case law relative to accident insurance that indicates the existence of an Oklahoma public policy favoring the denial of benefits to an innocent beneficiary. In sum . . . [u]nder Oklahoma law, for purposes of an accidental death and dismemberment insurance policy, Oklahoma public policy does not prohibit the insured's beneficiary from recovering accidental death benefits in the context of the certified question.

Id. Applying Cranfill in the context of reasonable reliance, the court cannot so readily conclude, as does Defendant, that as a matter of law it would be unreasonable for Plaintiff

to believe that, as pertains to her policy, she would be denied benefits if her husband

became drunk, then drove and died in a car collision.  Here, Plaintiff has presented

evidence that she is an innocent beneficiary, and there is authority that paying insurance

benefits to an innocent beneficiary for accidental death benefits does not contravene

public policy even where the insured was legally intoxicated under state law.

Accordingly, the court finds that summary judgment is due to be denied on Plaintiff's

fraudulent misrepresentation claim.


## C. Bad Faith

Plaintiff alleges a claim for "abnormal" bad faith failure to pay.  (Pl. Resp. at 13.)

See National Ins. Ass'n v. Sockwell, 829 So. 2d 111, 126-30 (Ala. 2002) (discussing

"normal" and "abnormal" bad faith claims); State Farm Fire & Casualty Co. v. Slade, 747

So. 2d 293, 303-07 (Ala. 1999) (quoted at length in Sockwell).  Under Alabama law in

the "normal" bad faith case, in order for the insured "'to make out a prima facie case of

bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff

is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the

contract claim as a matter of law.'"  Slade, 747 So. 2d at 304 (quoting Thomas v.

Principal Financial Group, 566 So. 2d 735, 742 (Ala. 1990)).  "'Ordinarily, if the

evidence produced by either side creates a fact issue with regard to the validity of the

claim and, thus, the legitimacy of the denial thereof,'" the plaintiff will not be entitled to a

directed verdict and, thus, the bad faith claim will fail.  Id. at 304-05 (quoting Thomas, 566 So. 2d at 742).

The Supreme of Alabama, however, has recognized that occasionally exceptions will arise where a plaintiff will be allowed to proceed with a bad faith claim even though he or she is not entitled to a directed verdict.  In Slade, the Supreme Court of Alabama quoted Justice Jones' concurring opinion in Safeco Insurance Co. of America v. Sims, 435 So. 2d 1219, 1224 (Ala. 1983) wherein Justice Jones provided the following hypothetical as an example of an exception:

> Exceptions to the "directed verdict" rule will undoubtedly arise.  Take the case where the insurer insists that its refusal of payment was grounded solely on a particular entry in a hospital record, and plaintiff denies the very existence of such an entry.  Merely because the insurer may be able to withstand a directed verdict motion--the existence vel non of the record entry itself being an issue of fact--would not, as a matter of law, bar the plaintiff's tort claim.  This extreme example is to be distinguished from the more normal situation in which the factual dispute centers around the reasonable, but conflicting, inferences that may be drawn from a hospital record entry.  If the entry in fact exists and one of the reasonable inferences of fact which may be drawn therefrom supports a legal basis for denial of the claim, Plaintiff would not be entitled to a directed verdict on the contract claim; thus, the claimant would be barred from proceeding with his tort of bad faith claim, even though the issue of fact may be resolved adversely to the insurer and the contract benefits awarded to the insured.

Slade, 747 So. 2d at 305; see also Sockwell, 829 So. 2d at 128.  The Supreme Court of Alabama refers to the "'unusual or extraordinary'" case as the "'abnormal' bad-faith case."  Slade, 747 So. 2d at 306.  Thus far, the Supreme of Alabama has limited abnormal bad-faith cases to instances where the evidence demonstrated that

the insurer (1) intentionally or recklessly failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim.

Id. at 306-07; Sockwell, 829 So. 2d at 129-30.

Moreover, the bad faith claim must be judged based on the information which was before the insurance company at the time the decision to deny the claim was made. See Sockwell, 829 So. 2d at 130; see also Slade, 747 So. 2d at 316 n.6. "[T]he obvious reason for reviewing only the information and circumstances before the insurer at the time of the denial, is to view the conduct of the insurer within the factual framework existing at the time of its actions. To adjudge the existence vel non of bad faith in any other environment would be merely an exercise in judicial fiction." Aetna Life Ins. Co. v. Lavoie, 470 So. 2d 1060, 1071-72 (Ala. 1984).

Arguing that she has presented an abnormal bad-faith claim, Plaintiff relies on the third exception enunciated in Slade. Citing the May 12, 2000 letter in which Defendant denied Plaintiff's claim (see Def. Evid. Submission, Ex. Q), Plaintiff asserts that Defendant "denied [Plaintiff's] claim based solely upon its own in-house physician's determination, after reviewing the report from the Office of the Medical Examiner . . . , that Mr. Allegro's blood alcohol level 'contributed' to the automobile accident that caused his death." (Pl. Resp. at 14.) Plaintiff does not dispute that the medical examiner's report contains information that Mr. Allegro's "[b]lood obtained at necropsy was positive for ethanol at 0.178" (Def. Evid. Submission, Ex D (medical examiner's

27

cover letter & toxicology result), but Plaintiff points out that the report recites the cause

of death as "'blunt force trauma to the head and chest,'" not alcohol intoxication. (Id.)

Because alcohol intoxication is not listed anywhere in the report as a factor contributing

to Mr. Allegro's death, Plaintiff contends that Defendant "created its own debatable

reason to deny a claim and avoid bad faith punitive damage liability." (Id. at 15.)

Defendant retorts that "[t]he undisputed evidence" demonstrates that it denied

Plaintiff's claim based on information it obtained from numerous sources.  Defendant

points to the three letters it mailed Plaintiff during the investigation of her claim.  (Def.

Reply at 12.)  In those letters, Defendant indicated that it was awaiting and/or had

received information from the medical examiner's office, Baptist Hospital, Vaughn

Evergreen Medical Center, and the Alabama Department of Public Safety.  (Id.; Def.

Evid. Submission, Exs. N, O, P.)  Defendant contends that its conclusion that Mr.

Allegro's death was "caused by or resulted from" alcohol intoxication arises from its

assessment of these various documents and is not based upon a "debatable reason it

created" as Plaintiff alleges.  (Def. Reply at 13.)  Specifically, Defendant points to the

uniform traffic accident report which indicates that there were no contributing defects in

the vehicle Plaintiff's spouse was driving and that, at the time of the accident, there were

no adverse weather or road conditions.  (Def. Reply at 12-13; Def. Evid. Submission, Ex.

C; Pl. Evid. Submission, Ex. D.)  Defendant argues that the information before it ruled

out other potential causes and provided it with a reasonable basis upon which to deny

coverage based on the policy's alcohol intoxication exclusion.  The thrust of Defendant's

contention is that this is an "ordinary" bad faith case to which Plaintiff would not be entitled to a directed verdict. (Id.) In response to Defendant's argument, Plaintiff asserts that the only documentation Defendant's referenced in its denial letter to her was "the report from the Office of Medical Examiner" and that, therefore, Defendant cannot now claim that it relied on any other sources of information in denying Plaintiff's claim.[4] (Pl. Resp. at 14; Motions To Strike (Doc. Nos. 21, 22); Pl. Evid. Submission, Ex. C.)

The court agrees with Plaintiff to the extent that the court finds that there exists a genuine issue of material fact as to what information Defendant used to assess and deny Plaintiff's claim for benefits and that this dispute places this case in the abnormal category of bad faith. Defendant is correct that, in its written correspondences mailed to Plaintiff during the investigation of her claim, it stated that it was awaiting and/or had received various documents from entities and individuals with knowledge of the circumstances of Mr. Allegro's death, such as the treating hospitals and investigating law

---

[4] Plaintiff moves the court to "strike" three affidavits and an expert opinion which Defendant submitted in support of its Motion For Summary Judgment, including the affidavits of Defendant's expert and the medical examiner. Plaintiff asserts that to the extent Defendant is relying on the affidavits to oppose Plaintiff's bad faith claim, the affidavits should be disregarded because they were obtained by Defendant after the date it denied her claim. (Pl. Mots. to Strike (Doc. Nos. 21, 22).) Because Defendant has represented that it is not relying on these affidavits to oppose the bad faith claim (only to oppose Plaintiff's other claims such as breach of contract), the court finds that Plaintiff's Motions To Strike are due to be denied as moot. (Def. Responses to Pl. Mots. to Strike (Doc. Nos. 27, 28).) In fact, in ruling on Defendant's Motion For Summary Judgment, the court has not found the affidavits or expert opinion to be relevant or material to the legal theories which are dispositive of Defendant's Motion, and, thus, has not considered this evidence; thus, for this additional reason, Plaintiff's Motions are moot.

enforcement officers.  The fact, however, is that in its denial letter, Defendant explicitly referred only to a single source which its medical director reviewed, and that source was the report from the medical examiner.  (Def. Evid. Submission, Ex. Q.)  While Defendant contends that its decision was based on additional information, the court must construe all inferences in favor of Plaintiff.  In so doing, the court finds that a jury could infer and conclude based on the May 12, 2000 denial letter that the medical examiner's report was the only document forwarded to and reviewed by Defendant's medical director and, thus, was the only document upon which Defendant based its decision that the alcohol intoxication excluded coverage.  The court notes that the general reference to "information" in a subsequent paragraph of the May 12 letter does not dispel this inference.  (Id.)  When the paragraphs are read *in para materia*, a rational deduction is that "information" means the medical examiner's report.

Based on Defendant's own wording in its denial letter (id.), the court finds that it will be for the jury to determine whether any other document also formed the basis of Defendant's denial.  Thus, for purposes of this Motion, the court must look only to the report of the medical examiner to determine whether Defendant has created its own reason for denial.  (Def. Evid. Submission, Ex. E.)  The report does not contain an opinion that alcohol intoxication caused or otherwise contributed to Mr. Allegro's death, and the report is silent as to any of the factors which Defendant now deems critical in its assessment that alcohol intoxication, not other factors, caused Mr. Allegro's death.  (Def. Reply at 12-13.)  For example, the report does not provide any facts pertaining to the

30

condition of the vehicle, mechanical or otherwise, which could have caused the wreck; nor does the report contain any information as to the weather or roadway conditions. (Id.); cf. Freeman, 580 S.W.2d at 901 (stating that there was "no proof" that the insured's "intoxication had any causal relation to his death"; "[t]here may have been a steering failure, a blowout, or any number of other occurrences which caused the tragedy"). That information is contained in the law enforcement investigative reports. (Def. Evid. Submission, Exs. C, E; Pl. Evid. Submission, Ex. D.)

It may well be that, if, as Defendant alleges, it relied on information in addition to the medical examiner's report, such as the uniform accident traffic report and other information provided by law enforcement agencies, then it could withstand a directed verdict motion made by Plaintiff. However, the court finds that Defendant's May 12 denial letter conflicts with the other evidence which Defendant says supports its argument that it relied on a plethora of documents, thus, creating a jury issue as to which documents Defendant relied upon to deny Plaintiff's claim. In other words, similar to the example cited by Justice Jones, the dispute in this case does not center on conflicting inferences which can be drawn from particular documents; rather, the dispute revolves around whether the documents are legitimate sources upon which Defendant may predicate its denial of Plaintiff's claim. In short, the court finds that these facts render Plaintiff's bad

faith claim and "abnormal" claim.  Accordingly, summary judgment is due to be denied

on Plaintiff's abnormal bad faith claim.[5]

## D. Remaining Claims

Summary judgment is due to be granted in favor of Defendant on Plaintiff's claims

for fraudulent suppression, negligence and/or wantonness, the tort of outrage, normal bad

faith and civil conspiracy.  In its brief, Defendant has pointed out an absence of evidence

to support Plaintiff's these claims.  Thus, the burden shifted to Plaintiff to designate

specific facts illustrating a dispute for trial.  Because Plaintiff's Response does not

---

[5] The court notes that neither party has addressed whether Plaintiff's estoppel argument, discussed in Section IV.A *supra*, has a bearing on Plaintiff's bad faith claim. In *Ex parte* Finkbohner, *supra*, the plaintiffs sued an insurance carrier, alleging breach of contract and bad faith refusal to pay a claim. 682 So. 2d 409, 414 (Ala. 1996). The plaintiffs claimed that the insurer was guilty of bad faith because it refused to pay a cosmetic claim based on a definition of "cosmetic surgery" in a policy not disclosed to the plaintiffs. On its breach of contract claim, the plaintiffs raised an estoppel theory, contending that the insurer was precluded from relying on the undisclosed policy provision, and further argued that it could "base a bad faith claim on this estoppel theory." Id.  Citing Brown Machine Works & Supply Company, *supra*, and § 27-14-19 of the Code of Alabama, the court stated that it had not yet addressed whether a bad faith claim could be maintained against an insurer where the insurer relied on a policy provision not disclosed to the insured. Id. at 414.  The court stated that, "[i]n the absence of fraud, the existence of an otherwise valid coverage exclusion in a policy would arguably provide the insurer with a legitimate or debatable reason for denying a claim." Id.  The Finkbohner court did not decide this issue because the plaintiffs had not raised the argument in the trial court. Id.  Because Plaintiff has not relied on an estoppel theory as the basis for her bad faith claim, this court also need not examine its impact, if any, on Plaintiff's abnormal bad faith claim.  The court merely notes the novelty of the issue.

address these five claims, the court finds that they have been abandoned.[6]  See Resolution

Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (abandoned claims);

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (summary judgment

standard).

## V. ORDER

For the foregoing reasons, it is CONSIDERED and ORDERED that Defendant's

Motion For Summary Judgment be and the same is hereby GRANTED in part and

DENIED in part as follows:

(1) GRANTED as to Plaintiff's claims for fraudulent suppression, negligence

and/or wantonness, tort of outrage, normal bad faith and civil conspiracy; and

(2) DENIED as to Plaintiff's claims for breach of contract, fraudulent

misrepresentation, and abnormal bad faith.

It is further CONSIDERED and ORDERED that Plaintiff's Motions To Strike be

and the same are hereby DENIED AS MOOT.

DONE this 13th day of March 2003.

_Ira De Ment_
_____
SENIOR UNITED STATES DISTRICT JUDGE

---

[6] The court notes that, in the proposed pretrial order submitted by the parties in compliance with the court's February 11, 2003 Order (Doc. No. 33), Plaintiff did not include these claims.  The court considers Plaintiff's omission an additional indication that she has abandoned these claims.



1.  <u>Appealable Orders</u>: Courts of Appeals have jurisdiction conferred and strictly limited by statute:
    <u>*Appeals from Final Orders Pursuant to 28 U.S.C. § 1291*</u>: Only final judgments for orders of district courts (or final orders of bankruptcy courts which have been affirmed by a district court under 28 U.S.C. §158) usually are appealable. A "final" order is one which ends the litigation on its merits and leaves nothing for the district court to do but execute the judgment. A magistrate's report and recommendation is not usually final until judgment thereon is entered by a district court judge. Compare Fed.R.App.P. 5.1, 28 U.S.C. §636(c).

    In cases involving multiple parties or multiple claims, a judgment as to fewer than all parties or all claims is not a final, appealable decision. Fed.R.Civ.P. 54(b) does permit the district court to expressly direct entry of the judgment as fewer than all of the claims or parties. See Pitney Bowes, Inc. v. Mestre, 701 F.2d 1365, 1369 (11th Cir. 1983), cert. denied 464 U.S. 893(1983). Certain matters, such as attorney's fees and costs, are collateral and do not affect the time for appealing from the judgment on the merits. Buchanan v. Stanships, Inc., 495 U.S. 265, 108 S.Ct. 1130, 99 L.Ed 2d 289(1988); Budinich v. Becton, 485 U.S. 196, 108 S.Ct.1717, 100 L.Ed 2d 178 (1988)

    <u>*Appeals Pursuant to 28 U.S.C. § 1292(b) and FRAP 5*</u>: The certificate specified in 28 U.S.C. § 1292(b) must be obtained before an application for leave to appeal is filed in the Court of Appeals. Denial or refusal by the district court to issue the certificate is not itself appealable.

    <u>*Appeals Pursuant to 28 U.S.C. § 1292(a)*</u>: Pursuant to this statute, appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions..." and "[i]nterlocutory decrees... determining the rights and liabilities of parties to admiralty cases..." This statute does not permit appeals from temporary restraining orders.

    <u>*Appeals pursuant to Judicially Created Exceptions to the Finality Rule*</u>: These limited exceptions are discussed in many cases including (but not limited to): Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed 2d 1528 (1949); Forgay v. Conrad, 6 How. (47 U.S.) 201 (1848); Gillespie v. United States Steel Corp., 379 U.S. 148, 152, 85 S.Ct. 308, 311, 13 L.Ed 2d 199 (1964); Atlantic Federal Savings & Loan Assn. Of Ft. Lauderdale v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371 (11th Cir. 1989). Compare Coopers and Lybrand v. Livesay, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed 2d 351 (1978); Gulfstream Aerospace Corp. V. Mayacamas Corp., 485 U.S. 271, 108 S.Ct. 1133, 99 L.Ed 2d 296 (1988).

·   <u>Time for Filing</u>: To be effective a notice of appeal must be timely filed. Timely filing is jurisdictional. In civil cases FRAP 4(a) and 4(c) set the following time limits:

    <u>*FRAP 4(a)(1)*</u>: The notice of appeal required by FRAP 3 "must be <u>filed with the clerk of the district court</u> within 30 days after the date of entry of the judgment or order appealed from; but if the United States or an officer or agency thereof is a party, the notice of appeal may be filed by <u>any party</u> within 60 days after such entry..." (Emphasis added) To be effective, the notice of appeal generally must be filed in the district court clerk's office within the time permitted. If a notice of appeal is mailed, it must be timely received and filed by the district court to be effective. FRAP 4(c) establishes special filing provisions for notices of appeal filed by an inmate confined in an institution, as discussed below.

    <u>*FRAP 4(a)(3)*</u>: "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the <u>first</u> notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period last expires." (Emphasis added)

    <u>*FRAP 4(a)(4)*</u>: If <u>any</u> party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in FRAP 4(a)(4), the time for appeal for <u>all</u> parties runs from the entry of the order disposing of the last such timely filed motion outstanding.

    <u>*FRAP 4(a)(5) and FRAP 4(a)(6)*</u>: The district court has power to extend the time to file a notice of appeal. Under FRAP 4(a)(5) the time may be extended if a motion for extension if filed within 30 days after expiration of the time otherwise permitted to file a notice of appeal. Under FRAP 4(a)(6) the time may be extended if the district court finds upon motion that a party has not received notice of entry of the judgment or order and that no party would be prejudiced by an extension.

    <u>*FRAP 4(c)*</u>: "If an inmate confined in an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a notarized statement or by a declaration (in compliance with 28 U.S.C. § 1746) setting forth the date of deposit and stating that first-class postage has been prepaid.

    <u>Format of Notice of Appeal</u>: Form 1, FRAP Appendix of Forms, is a suitable format. See also FRAP 3(c).
    A single notice of appeal may be filed from a (single) judgment or order by two or more persons whose "interests are such as to make joinder practicable..." (FRAP 3(b))

    <u>Effect of Notice of Appeal</u>: A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction (see Fed.R.Civ.P. 60) or to rule on a timely motion of the type specified in FRAP 4(a)(4).



# COURTROOM TECHNOLOGY TRAINING
## is now available for lawyers, paralegals and legal assistants



The court requires litigants to use the digital evidence presentation system available in each courtroom.  The system enhances evidence display to the court and the jury, provides flexibility to advocates and witnesses in identifying parts of images and documents, facilitates document enhancement to correspond with witness testimony, and permits electronic capture and retrieval of documents created during the hearing or trial.

## SCHEDULE YOUR TRAINING EARLY

Training is conducted every Friday at noon - bring your lunch.  Appointments must be made by noon on Tuesday before Friday training. To schedule training, or for answers to other questions, contact Karlene Burkhard, Telecommunications and Technologies Specialist, by calling 334-954-3631 or e-mailing her at Karlene_Burkhard@almd.uscourts.gov   You may also contact the courtroom deputy of the judge who will preside at your hearing or trial.  THE DIGITAL EVIDENCE PRESENTATION SYSTEM MAY BE USED ONLY BY PERSONS WHO HAVE BEEN OFFICIALLY TRAINED AND CERTIFIED.  Please schedule your training at least two weeks before trial.

Participants can obtain 1.0 CLE credit for this training.